**Charles Petty, Plaintiff-Appellee, v. Illinois Central Railroad Company, Defendant-Appellant.**

**Gen. No. 46,580.**

First District, First Division.

January 9, 1956.

Released for publication February 27, 1956.

Herbert J. Deany, Erle J. Zoll, Jr., and Charles I. Hopkins, Jr., all of Chicago, for defendant-appellant; Joseph H. Wright, of Chicago, of counsel.

James A. Dooley, of Chicago, for plaintiff-appellee.

JUDGE BURKE delivered the opinion of the court.

Charles Petty sued the Illinois Central Railroad Company to recover damages for injuries suffered when the automobile in which he was being driven collided with defendant's suburban train at about 10:55 P. M. on Saturday, October 13, 1951. The court entered a judgment for $75,000 on a verdict returned by a jury. Motions by the defendant for a directed verdict, for judgment notwithstanding the verdict and for a new trial were denied. Defendant appeals.

The impact occurred at the intersection of the tracks of defendant's Blue Island suburban branch with Ashland Avenue, a block south of Chicago. This is a single track line extending in a southwesterly direction from Kensington, a station on the south side of Chicago, to Blue Island. The branch is 4.42 miles long. From Blue Island station, the southwest terminal, to Burr Oak, the first station to the northeast, it is 0.55 of a mile; from Burr Oak to Ashland Avenue it is 0.49 of a mile; and from Ashland Avenue to Kensington it is 3.38 miles. The single track crosses Ashland Avenue running southwest to northeast at an angle. Ashland Avenue is a heavily traveled north and south highway, paved with concrete. It is 40 feet wide from curb to curb and carries two northbound and two southbound traffic lanes. About 200 feet north of defendant's right of way a line of the Rock Island lines crosses Ashland Avenue in an easterly and westerly direction. The posted speed limit on Ashland Avenue in the vicinity of the crossing is 45 miles an hour. Trains run in both

directions on defendant's track. The trains crossing Ashland Avenue are classified as northbound and southbound. There are 32 southbound trains and 29 northbound trains each weekday, some labeled "express" and some "local express." In addition to the scheduled trains, extra or nonscheduled trains operate on the track and cross Ashland Avenue. These are not passenger trains. The man in the interlocking tower at West Pullman, one mile east of Ashland Avenue, recorded that on the day of the occurrence 34 southbound trains and 34 northbound trains moved over this track.

North of the tracks and west of the highway there is a one story building, used at the time as a tavern, and north of that a two story building used as a residence. The south side of the tavern building is 35 feet from the tracks. A surveyor testified for plaintiff that from "the front of the tavern to Ashland" measures "about 21½ feet." A plat admitted by agreement shows a distance of 27 feet from the front wall of the tavern to the western edge of the Ashland Avenue roadway. The gate standard in the northwest quadrant is 31 feet from the north rail and 4½ feet from the west edge of the Ashland Avenue roadway. South of the track and east of Ashland Avenue is located the suburban station for Ashland Avenue. It consists of a ground level platform about 30 feet long, followed by a stairway leading to an elevated platform 209 feet long, on which platform a wooden shelter is provided for passengers. The west end of the ground level platform is 11 feet from the east edge of Ashland Avenue. The platform is 8 feet wide and runs parallel to the track on the south side thereof. South of the platform and east of Ashland Avenue there is located a trailer camp consisting of several houses surrounded by trailers.

The crossing is protected by automatic flashing signals in combination with short-arm gates. In addition there are crossbuck signs to indicate the presence of a

track, and a standard highway sign located 410.2 feet north of the intersection, west of the highway, as a preliminary warning to southbound vehicular traffic. Back to back flasher lights are mounted on gate standards located in the northwest and southeast quadrants of the intersection. These lights are 7½ to 8 feet high. The gate arm on the northwest corner has three red lights affixed to the top of the arm. The one at the end of the arm is steady and the other two are flickering lights. This arm is mounted on a gate standard at the northwest corner, and when lowered extends across the two southbound lanes of Ashland Avenue approximately parallel with the track, on the north side thereof. A similar arm is mounted on the southeast standard and when lowered, extends across the two northbound lanes. The crossing bell is located at the top of the standard in the southeast quadrant.

The crossing protection complies with the orders of the Illinois Commerce Commission. It is operated on a closed circuit principle. The rails are divided into sections called blocks by the placing of insulated joints at various locations. These sections of rails are energized by an alternating electric current, and at one end of the rail section or block a relay is attached by means of a cable. On the other end of the block there is a source of energy which is fed into and through one rail to the relay end, through the relay, back through the other rail, connecting to the other end of the source, which makes a closed circuit. As long as there is no broken rail, no broken wire or train present on this track, the relay is in an energized position. In other words, it is held up against the force of gravity. When a train enters this section, the wheels of this train act as a short circuit from one rail to the other rail. It is easier for the current in the rail to come from the source through one wheel into the axle, into the other wheel, back into the rail and back again, than it is for it to go up and go through the relay. Consequently,

when a train enters this section, the relay immediately drops because the energy is failing to reach it and gravity pulls it down.

A train coming from Blue Island enters one of these block sections at the starter point, which is 2024.1 feet west of Ashland Avenue, and the presence of this train on the track shunts out the energy from the relay and the relay drops. It requires about three quarters of a second for that relay to drop. The dropping of the first relay, in turn, causes another one to drop and that, in turn, causes the light on the flashers to start working and the bell to start ringing. A third relay works the gates. The dropping of the second relay causes the energy to be taken from the third relay. The third relay is a time-delay relay. When the energy is taken, it takes approximately 3 to 4 seconds for it to release. After it releases and drops, the gates start down. While the gates are lowering, the bells ring constantly, the lights flash on the two masts on each side of the tracks, and the lights on the gate arm burn. As the train approaches the crossing, the gates remain down and the lights on the two masts and on the two gate arms continue to burn or flash until the rear end of the train clears another section, which, at Ashland Avenue, is 5 or 6 feet east of the east edge of Ashland Avenue. As soon as the rear of the train clears that point, the gates start rising. During the lifting period the lights continue to flash and burn on the gate arms and the flashers until the gates have gotten in the clear. Then the lights and flashers go out and the gates are again in an upright position. There are two sources of energy of this installation. One source is commercial electricity. In the event that the commercial electricity goes off there is a relay that immediately drops and cuts in a set of batteries which supply energy for approximately three days in case the commercial power should not come back. The trippers at the start of the block are set so that the fastest train that uses the crossing

372

gives a 25-second warning minimum time to pedestrians and highway traffic. At this crossing, for trains moving northeast, the tripper more than complies with the 25-second minimum. The tripper is 2004.1 feet from the west edge of the Ashland Avenue roadway.

On the night of the occurrence plaintiff, who was 25 years of age, and Arthur Luckett, who at the time of the trial was in the armed forces, drove in a 1940 Dodge car owned by plaintiff's father to a theater at 47th and South Park Avenue, Chicago, and attended a show. Thereafter they went to a gasoline station where plaintiff purchased gasoline. They were on their way to Robbins, a village west of Blue Island. Plaintiff asked Luckett to drive when they were at the gasoline station because he was tired, and Luckett did so. Plaintiff sat in the front seat with Luckett. After plaintiff bought the gasoline they started south. They got on Ashland Avenue and in approaching the intersection of the defendant's tracks they were traveling in the lane farthest west. They were having a general conversation and plaintiff was not watching Luckett intently. He looked at Luckett from time to time to talk to him.

There is a conflict in the testimony as to approximately what happened. There was a collision. The front end of a northeast bound two-car train approaching Ashland Avenue and the front right side of the car driven by Luckett came together, the point of contact being placed by plaintiff's witness Cent at the center of the inner southbound lane, and by plaintiff's witness Land at a point about the center of the highway. The defendant's witnesses Quiett and Wilson placed the point of impact 10 feet east of the center line of Ashland Avenue, and in this they are corroborated by photographs and defendant's witnesses Pruitt and Sled, both of whom testified the automobile passed around the east end of the lowered gate in the northwest quadrant. The front right end of the car wedged under the front center of the train, and the train

373

pushed or dragged the car about to the end of the Ashland Avenue station. The impact and skid marks were visible and were identified. The conductor of the train got off the first car and, seeing the automobile on the front of the train, called the power supervisor and went to the tavern to call the police and the ambulance, both arriving in a few minutes. Plaintiff was still in the car but Luckett was outside walking around. The men in the ambulance removed plaintiff from the car and took him to St. Francis Hospital in Blue Island. One of the policemen took Luckett to the same hospital in the squad car. The train was then disengaged from the automobile and, the brakes and angle cock of the lead car being damaged, the train was moved back to Blue Island.

Three occurrence witnesses testified for the plaintiff. Adam Cent said that after leaving his home in the trailer camp at about 10:45 P. M., and while standing about 35 feet south of the flashing light signal, he saw an eastbound train about 300 feet away approaching from the west and plaintiff's car coming from the north. He said that the gates did not come down, the bells did not ring and the lights did not flash; that the "headlight on the train seemed to be mighty dim and the lights in the car were not too bright"; that the front end of the train and the right side of the car came together; and that the contact was on the west side of the street, about the middle of the inner southbound lane. He testified further that within an hour men from the railroad came out and worked on the crossing protection "but the gates kept acting up there." He said that about 5 or 10 minutes after the accident two men got hold of the gate and pulled it down by hand; that up to that time the flasher lights had not come on; and that when the men pulled the gate down the lights did go on and the bells started ringing. Over defendant's objection the witness testified that on the Sunday before the accident he saw the gates going up and down

374

while a train was traversing the crossing; that they were "flopping around," "just as if there was a ghost or something actuating them or wind, and there was no wind around."

Allen Land, called by plaintiff, testified that he was driving south on Ashland at a speed of 45 miles an hour; that plaintiff's car was about 150 feet ahead of him, going about 30 or 35 miles an hour; that as plaintiff's car got to the crossing "the gates started down and the train was there"; that the gates "just started, they just had started to come down when the train was there"; that just before the impact plaintiff's car swerved in a southeast direction and its tail lights lit up, indicating that the brakes had been applied; that the automobile was right on the track when the gates started to come down; and that the flasher lights were not flashing and the bell was not ringing. He testified further that the "lights did not go on when the gates started down and the flasher lights did not light up. It was total darkness." The witness drew a line marked "H" on a picture containing a panoramic view of the area to indicate the point to which he saw the gate drop, and said, "I did not see the gate go back or go down further." He said that the train "was going something like 40 to 45 miles per hour."

The plaintiff, in his own behalf, testified that on the night of the occurrence he was in his father's automobile with his friend Arthur Luckett. They were on their way home. At a gasoline station plaintiff asked Luckett to take over the driving because he, plaintiff, was tired and wanted Luckett to drive as an accommodation. Plaintiff sat beside Luckett. In approaching the Ashland Avenue intersection with defendant's tracks the car was moving south in the outer or westerly lane at a speed of 30 to 35 miles an hour. About 100 feet from the crossing plaintiff noticed that the crossing gates were up and that the lights on them were not lit. The car continued toward the crossing at the

same speed. Plaintiff did not see any lights flashing and did not hear any bells ringing as the car approached the intersection. When the car was "eight to eleven feet from the nearest north track" plaintiff saw the gate on the southeast side of the highway "start to wave." The northwest gate remained quiet in an upright position. At that instant Luckett swerved easterly and the collision occurred.

Harry Pruitt, the engineer of the suburban train, called by defendant, testified that the train left Blue Island at 10:50 P. M.; that the first stop was Burr Oak, a regular stop; that the next station is Ashland Avenue, which is a flag stop; that between Burr Oak and Ashland Avenue the train went at a top speed of about 30 miles an hour until it got to within 200 feet of Ashland Avenue, "where I slowed down to approximately 25 miles an hour just in case we happened to have passengers who want to get on at Ashland Avenue. This gave me plenty of time to stop at the station if need be." Witness testified further that from Wood Street, the first crossing west of Ashland Avenue, the latter crossing can be seen very plainly, especially at night; that at Wood Street is located the tripper which operates the gates at Ashland Avenue; and that as the train crossed Wood Street, the Ashland Avenue gates ahead of the train went down and the red lights on the post and on the gates were flashing back and forth in a normal manner, and the crossing bell was ringing. Going into Ashland Avenue he said he was standing up ringing the foot bell; that he saw no traffic approaching on Ashland Avenue from either direction; that when he got to within 25 feet of the concrete pavement there was a car in the east lane coming south, so he put the brakes in emergency immediately; that "he was about the same distance north of me, north of the impact, as I was west. He was traveling south, really southwest, because he had kinked the car to go around the gates. I observed the car was turning toward me and I struck him then. His motor came in contact with

the left front corner of my cars." Pasquale Esposito, the flagman on the train, testified that he was sitting near the front of the second car; that as the train reached the pavement of Ashland Avenue he observed that the gates on the south side of the train were down; that he observed all the lights were lit; that all four lights were working on the cross arm; that the flashers were working; that he heard the air released and "figured we were coming to a stop and right after that I heard the crash." He testified that on moving across Ashland Avenue, as the train began its trip back to Blue Island, the lights lit, the gates went down and the flashers flashed. He said that the Ashland Avenue protection also functioned normally on the return trip from Blue Island to Kensington, just as it had on the two round trips made earlier in the evening.

Grace Mager, a witness for defendant, lives about 90 feet south of the tracks and about a half block east of Ashland Avenue. She testified that she was watching television in her home. As the train approached the crossing she heard the bells ringing. She did not say whether any lights were flashing because she was watching her television set. The first thing that attracted her attention was the sound of the crash. She "jumped up, ran out of the house toward the train tracks" in time to see a train pushing a car down the track. When she got outside she also saw that the gates were down, the flasher lights were flashing and the lights on the gate were lit. She also heard the bell ringing. She stayed there until the train crossed Ashland Avenue on the way back to Blue Island. When the train went back over the intersection the lights started flashing again and the gates went down. She did not hear a bell at that time. She watched the train until it got over Ashland Avenue and observed that the gates went up.

Charlotte Kazmierczak lives in the southeast quadrant of the intersection about 250 feet from defendant's right of way. She testified that she was sitting in her

377

living room watching television. She heard a crash. She "jumped up as fast as I could, ran to the southwest window of my kitchen. . . . I saw a train dragging a car and saw a lot of sparks." She saw the gates were down and the flasher lights and the lights on the gate arm were lit. After 15 or 20 minutes following the accident she saw the train move back toward Blue Island and as it did so, the gates were working. Her daughter Charlene, nine years old at the time, said that when she and her mother heard the crash they both ran outside. She looked at the crossing and saw the train dragging the car. She testified that at that time she saw that the flasher light was flashing, the gates were down and the lights on the gate were on.

Christian W. Goeke, the conductor, testified that he was standing up at the rear of the first car. He did not observe the gates or crossing protection prior to the accident. When the train came to a stop after the crash, he got off the southwest corner of the first car. Before getting off he looked both ways. He said "When I looked to the south I seen the gates raising. It was a little better than half ways up, and when I looked the other way I seen the automobile on the front end of the train." He testified further that going back with the train to Blue Island he noted the gates were working, saw the gates come down and heard the bells ringing, and that on the next trip from Blue Island to Kensington the Ashland Avenue crossing protection was functioning normally.

John Sled, testifying for the defendant, operated the tavern on the west side of Ashland Avenue next door to the tracks. At the time of the occurrence he was standing alone between the bar and the window, looking out the window. He said he had a good view of the crossing and could see "some distance north on Ashland Avenue." He said he saw the collision and that "the first thing I saw I heard a bell start to ring and then the gates started coming down. The gates came

down, the lights started flashing. The lights started flashing when the gates started coming down. The gates came all the way down and the bell started ringing. All the lights were working, flashing. I next saw a car coming south in the southbound lane. It was in the second southbound lane—third southbound lane, about 50 feet from the crossing. I saw the car before it came to the gates swinging over to the east and it started to go around the gates. I seen it go around the lowered gate on the north side and then the train come up and hit the car. I first saw the train when it started crossing Ashland Avenue. I heard that clink, clink, clink of the bell ringing. . . . The car got hit from the front on the right side. The two came together on the highway between the gates." The witness said he knew Adam Cent. He said when he heard the bells and saw the gates go down he did not know there was going to be an accident. The tavern had a neon beer sign that "lit up at least half a block."

T. B. Thompson, signal engineer for the defendant, testified as to the character of protection at the crossing, the sequence of operation and the protective devices as hereinbefore related. In addition he said that every conceivable source of trouble that one would expect to find in that type of gate could be divided into three parts. The first would be trouble in the track circuits. There could be a broken wire connecting the rails, or a broken wire connecting the relay. In each case, the track being on the closed circuit principle, the relay would be de-energized and pulled down by gravity and the signals would be set into operation. The second would be a case of trouble in the control box, which might be from a broken wire. Again the control apparatus being on the closed circuit principle the relay or relays would be pulled down by gravity and·the apparatus would be set in operation. The third, in case of a broken wire or trouble in the motor, the gates, working on the closed circuit principle, would be re-

■■■■■■■■
■■■■

leased and the gates would be pulled down by gravity and assume the most restrictive position. He testified on cross-examination that to his knowledge a relay could not stick and he had never known of a relay to stick or of a gate to get stuck in an upright position. He stated that if a gate were pulled down by hand it would cause the light on that gate and on the opposite gate as well as all the flashers, to light up, but it would not cause the bell to ring, the bell being on a separate circuit. He testified that if the gate were to drop as witness Land said it did, that would have meant that the end of the gate had lowered five feet from its normal vertical position, and that if the gate were to be moved in that manner, the lights on the gate and the flashers would light.

R. B. Thomas, chief engineer of the Illinois Commerce Commission, testifying for the defendant, said that in 1934 there was under way a program of the Commerce Commission to improve crossing protection; that a rather extensive program was developed; that he was associated with the development of that program and had been connected with crossing protection ever since. He has made considerable study and research in the development of new crossing protection, among which was the reflector type of crossbuck signs and short-arm gate combined with the flashing light signals such as there is at the intersection where the accident occurred. In his experience with signal systems of this type, he has never known of a relay to stick, holding the gates up. He said, "The TR relay . . . is held in an upward position by a contact and the current flows through that contact into the relay. As soon as the current is cut off, that relay just falls, there is nothing there to hold it. . . . When it falls it throws the current through the XR relay and the flashers begin to operate and the gates drop." On cross-examination, to the question "And if there is any-

380

thing wrong with the relay it won't work?" he answered, "Well, I wouldn't say that. There's nothing to hold it. It just has to drop. It's like holding a flatiron in your hand, when you let go of it there is nothing else for it to do but drop." He testified: "All I can say is that I don't know how it can stick, one that goes by gravity, I don't know how. It just has to fall. . . . There is nothing to hold them. They are gravity gates and they are so balanced if the current is off or anything like that, the gate has to drop."

Mrs. Charlotte Kazmierczak, who lived near the intersection for 15 years, testified that if the crossing protection is out of order, the gates "are always down and the flashers are on." She reported such a condition two or three times in the 15 years "I am living there." John Sled, who operated his tavern adjacent to the tracks at the intersection for five years, testified that on two or three occasions in that period the gates did not operate and that at such times the gates were in a down position. Daniel F. Quiett, assistant superintendent of freight service for the defendant, testified that he got word of the accident at about 10:55 P. M.; that he arrived at the scene about 11:55 P. M.; that when the train, after the accident, proceeded west on to Ashland Avenue, the crossing protection operated normally, as it did subsequently when later trains passed the crossing; that the signal maintainer arrived about 12:20 A. M.; and that he, Quiett, saw him make checks which showed that the crossing protection was working perfectly.

Russell Mager, the husband of Grace Mager, testified that he learned of the accident when his wife woke him up; that he was asleep on the divan; that when he got outside the train had come to a stop; and that when the train was moved back west across Ashland Avenue after the accident "the flashers started working and the gates went down." Homer F. Wilson, assistant

381

superintendent of passenger service, arrived on the scene around 11:45 P. M. The train had departed when he arrived. He testified that when the train from Blue Island crossed the Ashland Avenue intersection at approximately 11:55 P. M. the protection worked normally as it did on returning from Kensington at about 12:14 A. M. He saw the signal maintainer arrive at about 12:20 A. M. and saw him test the crossing protection mechanism. The tests showed nothing wrong with the mechanism.

Frank Anderson, trainmaster for the defendant, arrived about 11:15 P. M. He supervised the movement of the train involved in the collision back across Ashland Avenue so it could go back to Blue Island. He said that when he gave the proceed signal the lights actuated; that both gates were down; that the bells were ringing, flashers working; that all lights lighted up including those on the flashers and on the gates; that the gates were down when he gave the signal to move; and that when he got over the crossing to the west, the gates were released and went up and the flasher lights went out. When subsequent trains crossed the crossing that night he observed that the crossing protection functioned normally. He watched the signal maintainer test the protection mechanism and it operated properly and normally. Santy Corsello, signal maintainer for the defendant, arrived on the scene about 12:20 A. M. He testified about how he immediately tested the crossing protection and found it in perfect order. He was at the crossing until 1:20 A. M. watching the trains go over the crossing. No repairs were needed and he made none. He also testified that two days before the accident he had made a check of the crossing protection, finding nothing out of order. Fred W. Lussenhop, on the night of the accident, was on duty as a police officer. He and his partner, John Swabowski, were in a squad car cruising

in the neighborhood when he got a radio call concerning the accident. He arrived there about 10:56 P. M. Seeing the car pinned under the front of the train and plaintiff still in the front seat, the witness called an ambulance and a tow truck. The man in the ambulance took plaintiff to St. Francis Hospital in Blue Island and the witness took the driver, Arthur Luckett, to the same hospital in the squad car. The witness returned to the intersection just in time to see the train "backing west across the crossing going into Blue Island again and I noted the red lights and the crossing gates were down and the flashers were working." When the train passed as he drove north he noticed the gates were working in good order. As soon as they were up the lights went out. John Swabowski, a part-time patrolman, was Lussenhop's partner on the night of the accident. He testified that when the train moved in the direction of Blue Island, the Ashland Avenue protection operated normally, the flashers were flashing and the bell was ringing.

■■ Defendant, arguing that there is no credible evidence to support the judgment, asks that we enter judgment for it. Defendant asserts that although the testimony is conflicting as to precisely how the mishap occurred, the testimony of plaintiff's witnesses is so inconsistent, contrary to natural and scientific law, and otherwise beyond the bounds of belief, that it will not support a verdict in his favor, and that there is no credible evidence of defendant's negligence. Defendant states that the rational and credible explanation as to why the collision took place is that Luckett tried to go around the lowered gate, and that because the record is devoid of any showing of due care on the part of plaintiff or Luckett that the court erred in denying its motion for judgment notwithstanding the verdict. We are of the opinion that the evidence shows that the relationship between plaintiff and Luckett was

that of principal and agent, and that plaintiff had the burden of proving due care on his part, and also that his agent Luckett was in the exercise of due care prior to and at the time of the occurrence. Viewing the evidence in its aspect most favorable to plaintiff, together with all reasonable inferences arising therefrom, we cannot hold that the trial judge erred in refusing to give judgment notwithstanding the verdict.

We turn to a consideration of defendant's contention that the judgment is against the manifest weight of the evidence. The testimony of Cent, Land and plaintiff that the gates were up, the lights dark and the bell silent is contradicted by the testimony introduced by defendant. Five of its witnesses, Pruitt, Grace Mager, Charlotte Kazmierczak, Charlene Kazmierczak and Sled testified that the lights were flashing, and four of them Grace Mager, Charlotte Kazmierczak, Charlene Kazmierczak and Sled, testified that the bells were ringing. The testimony of defendant's witnesses regarding the operation of the gates and the lights was not contradicted or shaken. The testimony of defendant's witnesses that the protective system was operating and that of Thompson, the signal engineer, and Thomas, the chief engineer of the Illinois Commerce Commission, is convincing. The testimony of Thompson and Thomas as to the operation of the crossing protection stands uncontradicted. The uncontradicted evidence establishes that there was a distance of 2004.1 feet for a train to travel from the tripper to the west edge of Ashland Avenue. A train traveling 90 miles an hour would be 44.1 feet west of the west edge of Ashland Avenue 15 seconds after hitting the tripper. Pruitt, the engineer, placed his maximum speed at 30 miles an hour. Land testified that the train was moving at a speed of 40 to 50 miles an hour. We are convinced that the judgment is against the manifest weight of the evidence and that the court erred in not granting a new trial.

384

We do not think that the trial judge erred in sustaining plaintiff's objection to an inquiry of the defendant as to whether Luckett had a driver's license. We are of the opinion that the court did not err in refusing to admit testimony by the engineer Pruitt of a conversation he overheard between the police officer and Luckett immediately following the stopping of the train. The agency relation between plaintiff and Luckett did not exist at the time of the conversation and the conversation did not constitute a part of the res gestae. Plaintiff's instruction No. 14 is erroneous in omitting a statement that plaintiff was required to prove that Luckett was in the exercise of due care prior to and at the time of the occurrence. Defendant states that this is the type of instruction the giving of which was held to be reversible error in Signa v. Alluri, 351 Ill. App. 11. The instruction summarizes the allegations of the complaint and the answer and is not vulnerable to the criticism voiced in the Signa case. We find that the court did not err in refusing to give six instructions tendered by the defendant.

For the reasons stated the judgment of the Circuit Court of Cook County is reversed and the cause is remanded for a new trial.

Judgment reversed and cause remanded for a new trial.

FRIEND, P. J. and NIEMEYER, J., concur.